| | |
|---|---|
| TOM PRICE and WILLIAM LEGG, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| ) | |
| v. ) | ORDER |
| ) | |
| ) | |
| CITY OF FAYETTEVILLE, NORTH ) | |
| CAROLINA; KATHERINE BRYANT, in ) | |
| her official capacity as Chief of Police for ) | |
| the Fayetteville Police Department; and ) | |
| JOHN DOE, individually and in his ) | |
| official capacity as Police Officer for ) | |
| Fayetteville Police Department, ) | |
| ) | |
| Defendants. ) | |

This matter is before the court on plaintiffs' motion for preliminary injunction, filed March 1, 2013 (DE 8, 10).[1] Plaintiffs allege defendants violated their First Amendment and Due Process rights during the 2012 Fayetteville Dogwood Festival, and plaintiffs seek preliminary injunction to prevent a similar alleged violation during the 2013 Fayetteville Dogwood Festival, scheduled to commence April 26, 2013. Defendants have responded in opposition, and the court heard oral argument on April 19, 2013, taking the matter under advisement. For the reasons that follow, the court denies plaintiffs' motion for preliminary injunction.

---

[1] The clerk noticed deficiency in original filing, and plaintiffs re-filed the motion on March 4, 2013.

## BACKGROUND

### A. Factual Summary

The following factual summary is based on all materials in the record, including the verified complaint, affidavits, and documentary exhibits attached to the preliminary injunction briefing. Additional findings of facts are included in the analysis further below.

1. Dogwood Festival

The Dogwood Festival is hosted by the Fayetteville, North Carolina Dogwood Festival Incorporated ("Dogwood Festival, Inc."), which is a private, non-profit organization governed by a board of volunteer directors and managed by one full-time employee and one part-time employee. (Defs' Ex. A ¶¶ 3-5). The Dogwood Festival is a three-day event held annually in downtown Fayetteville each April, featuring local and national musicians, artists, arts and crafts vendors, children's activities, and food vendors. (Id. ¶ 5).

The 2012 Dogwood Festival commenced on Friday, April 27, at 6:00 p.m. and ended on Sunday, April 29, at 6:00 p.m. (Pls' Ex. H at 4). About 200,000 to 250,000 people attended over the course of the three day event, and about 100,000 to 150,000 people attended on Saturday, April 28, 2012. (Defs' Ex. A ¶8). Dogwood Festival events took place on streets, parks, and sidewalks within a 40.3 acre portion of downtown Fayetteville. (Id. ¶9). In 2012, the following streets were closed to vehicular traffic for the Dogwood Festival:

- Ray Avenue: closed from Rowan Street to Hay Street
- Hay Street: closed from Pittman Street to Gillespie Street
- Mason Street: closed from Ray Avenue to Arch Street
- Maiden Lane Extension: closed from behind train station to Burgess Street

(Pls' Ex. H at 4; Defs' Ex. G). A map in the record illustrates the rough footprint of the festival and the location of events and booths, upon which the following description is based. (Defs' Ex. H).[2]

The Dogwood Festival includes music and performance events taking place at a stage in an area designated as Festival Park. A pedestrian walkway extends from near that stage over a pedestrian bridge continuing to the point of a traffic circle at the intersection of Ray Avenue and Maiden Lane Extension (hereinafter "the traffic circle"). Food and sponsors booths are set up along the pedestrian walkway, and additional booths continue past the traffic circle and onto Hay Street. An additional music stage and a midway with rides and other events are located along Maiden Lane Extension, with access from the traffic circle.

Linear park is bounded on three sides by streets closed for the Dogwood Festival, and it is intersected by a stream that flows from Festival Park under Ray Avenue and through Linear Park. An entrance into Festival Park, and an area reserved for Dogwood Festival children's events, is across Ray Avenue from Linear park. A shuttle pick-up and drop-off location is at the corner of Mason Street and Arch Street, across Mason Street from Linear park. Festival attendees also may utilize parking lots located on either side of Linear Park.

Due to limited space, the Dogwood Festival, Inc., uses a vendor application form to process requests for booths from arts and crafts vendors, commercial vendors, and non-profit organizations. (Defs' Ex. A ¶11). In 2012, approximately 250 vendor applications were received, and 132 applications were approved. Of those 250 applications, 10 were for non-profit information booths.

---

[2] Interpretation of this map is further informed by the Dogwood Festival event permit included with plaintiffs' materials, photographs of event locations, as well as a street closure map and an aerial photograph submitted by defendants. (Pls' Exs. H-K, Defs' Exs. G, I, J).

3

(Id.). Vendors with approved applications must submit a $25 application fee and booth rental fees ranging from $100 for non-profits to $225 for commercial vendors. (Id.).

With respect to governance and rules of the Dogwood Festival, the City of Fayetteville issued a special event permit allowing the Dogwood Festival, Inc., to host the 2012 Dogwood Festival. (Pls' Ex. H). Pursuant to the permit, the Dogwood Festival, Inc. remained responsible during the festival for any injuries and damages, claims and liabilty, for personal injury or property damage as a result of any negligent acts or omissions of the organization. (Defs' Ex. K).

In an effort to further safety of attendees by encouraging orderly flow of pedestrian traffic and minimizing crowd congestion in the Dogwood Festival, as well as minimizing litter and trash pickup, the Dogwood Festival, Inc., has implemented a rule confining distribution of all flyers, pamphlets, coupons, tracts, or any other printed material to designated areas. (Defs' Ex. A ¶ 7). In particular, the Dogwood Festival, Inc., allows distribution of such materials from rented booths, or from within Linear Park. (Defs' Ex. A ¶25, Pls' Ex. L). This rule is listed on the Dogwood Festival website and on signage posted at various locations throughout the Festival. (Defs' Ex. A ¶20, Ex. B ¶7, Pls' Ex. L).

2. Plaintiffs' dispute with the Dogwood Festival

Defendants and plaintiffs have asserted conflicting accounts regarding plaintiffs' efforts to distribute literature at the 2012 Dogwood Festival and the nature of defendants' response. The court need not resolve these disputed issues of fact for purposes of the present analysis.

According to plaintiffs, on Saturday, April 28, 2012, plaintiffs handed out religious tracts and visited with people at the traffic circle for thirty to forty-five minutes. A Dogwood Festival representative approached Legg and asked him to discontinue his literature distribution, but Legg

4

declined to cease his activity. The Dogwood Festival representative came back with Officer Doe, a police officer with the Fayetteville Police Department. Officer Doe ordered Price and Legg to stop distributing literature under threat of arrest. After further discussions, Price and Legg left in order to avoid arrest. (Verified Compl.; Pls' Ex. A, B).

On May 30, 2012, Legg, through counsel sent a letter to various Fayetteville city officials, seeking relief from the restriction on literature distribution. On June 14, 2012, Brent W. McConkey, Assistant City Attorney, sent a letter to plaintiffs' counsel contending no liability on the part of the city for the restriction promulgated by the Dogwood Festival, Inc., and suggesting alternatives, including obtaining a booth and distributing literature from designated areas. (Pls' Ex. L).

The 2013 Dogwood Festival will be held April 26, 2013, through April 28, 2013. The rules and layout of the 2013 Dogwood Festival will be substantially similar to that held in 2012. Plaintiffs would like to distribute religious literature at the traffic circle during the 2013 festival and future festivals, but for fear of arrest they are effectively deterred from doing so.

## B. Procedural History

Plaintiffs filed a verified complaint on March 1, 2013, under 42 U.S.C. §§ 1983 and 1988, seeking injunctive relief, declaratory relief, and nominal damages against defendants City of Fayetteville, North Carolina; Katherine Bryant, in her official capacity as Chief of Police for the Fayetteville Police Department; and unidentified defendant John Doe, individually and in his official capacity as police officer for Fayetteville Police Department. Plaintiffs allege defendants have deprived and will continue to deprive plaintiffs of their fundamental right to free speech under the First Amendment and right to due process of law, in connection with plaintiffs' interest in

distributing religious literature at the 2012 Fayetteville Dogwood Festival, and the upcoming 2013 Dogwood Festival.

In conjunction with their complaint, on March 1, 2013, plaintiffs filed a motion for preliminary injunction, pursuant to Federal Rule of Civil Procedure 65(a), in which they seek to enjoin defendants "from applying policy that facilitates a ban on literature distribution, on its face and as-applied, so as to prevent [plaintiffs] and third party individuals from engaging in literature distribution on public ways in downtown Fayetteville during the 2013 Fayetteville Dogwood Festival, future Dogwood Festivals, and other festivals taking place in downtown Fayetteville." (Mot. for Prelim. Inj. 1). Plaintiffs attach to their motion affidavits and documentary information about the Dogwood Festival, as well as a memorandum in support of the motion.

The court directed plaintiffs to notify defendants of the filing of the action, and ordered response to the motion for preliminary injunction within twenty-one days of service, and set hearing on the motion for April 19, 2013. On March 28, 2013, defendants filed a memorandum in opposition to the motion for preliminary injunction, attaching affidavits and documentary exhibits about the Dogwood Festival. On April 1, 2013, following inquiry to case manager regarding whether the court expected to receive live testimony at hearing, the court noted in text order that there was sufficient information in the record to permit the parties to advance their respective contentions in support of and in opposition to the motion, and the court noted that it anticipated oral argument only. At hearing on April 19, 2013, the court heard argument on the motion by counsel and took the matter under advisement.

6

## DISCUSSION

### A. Standard of Review

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). "A preliminary injunction is an extraordinary and drastic remedy," Munaf v. Geren, 553 U.S. 674 (2008), which "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter, 555 U.S. at 22. Accordingly, the Fourth Circuit has stated that a plaintiff seeking a preliminary injunction must "make a clear showing" of likelihood of success and irreparable harm. Real Truth About Obama Inc. v. Fed. Election Comm'n, 575 F.3d 342, 347 (4th Cir. 2009) (citing Winter, 555 U.S. at 20); see Dewhurst v. Century Aluminum Co., 649 F.3d 287, 290 (4th Cir. 2011).

The Fourth Circuit has recognized that a stricter standard is required for a mandatory preliminary injunction, which does not preserve the status quo, and that such an injunction is only granted in very specific circumstances, usually only when extreme or serious damage will result. See E. Tenn. Nat. Gas Co. v. Sage, 361 F.3d 808, 828 (4th Cir. 2004); Wetzel v. Edwards, 635 F.2d 283, 286 (4th Cir. 1980). In this case, although the injunction sought could be characterized as a mandatory preliminary injunction, defendants do not argue that the court should apply a stricter standard than the Winter test for a preliminary injunction. The court need not reach this issue because, even applying the Winter test, plaintiffs have failed to make a "clear showing" of entitlement to preliminary injunctive relief.

With respect to findings of fact and conclusions of law, a preliminary injunction is decided "on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981). "A party thus is not required to prove his case in full at a preliminary-injunction hearing," and the findings of fact and conclusions of law made by a court in ruling on a preliminary injunction are not binding at trial on the merits. See id.

Findings of fact and conclusions of law required by Federal Rule of Civil Procedure Rule 52 may be contained within the court's opinion denying a preliminary injunction. See Cable TV Fund 14-A, Ltd. v. Prop. Owners Ass'n Chesapeake Ranch Estates, Inc., 706 F. Supp. 422, 432 (D. Md. 1989); see also Ciena Corp. v. Jarrard, 203 F.3d 312, 321 (4th Cir. 2000). "It is well established that a court may make findings of disputed facts" on a written record consisted of "affidavits, exhibits and memoranda." See Cable TV Fund, 706 F. Supp. at 432.

Although the Fourth Circuit has not addressed the issue directly, district courts within the Fourth Circuit have recognized that "[w]hen the facts are sharply disputed, a preliminary injunction will not be granted" because a preliminary injunction requires a "clear showing." Prudential Sec., Inc. v. Plunkett, 8 F. Supp. 2d 514, 516 (E.D. Va. 1998); see Gantt v. Clemson Agr. Coll. of S.C., 208 F. Supp. 416, 418-19 (W.D.S.C. 1962) ("On an application for preliminary injunction, the court is not bound to decide doubtful and difficult questions of law or disputed questions of fact," and "[a]s a prerequisite to the issuance of an interlocutory injunction, . . . [t]here must be no disputed issues of fact."); see also First-Citizens Bank & Trust Co. v. Camp, 432 F.2d 481, 484 (4th Cir. 1970) (holding that contested factual issues "require resolution" before issuing a preliminary injunction).

8

## B. Analysis

Plaintiffs argue they have made a clear showing of likelihood of success on a claim based on a violation of the First Amendment because defendants have restricted their free expression in a manner that is not narrowly tailored to serve a significant government interest, and without providing adequate alternative channels of communication. (Pls' Mem. at 10-18). They contend that such violation of the First Amendment rights necessarily causes irreparable injury, is not in the public interest, and the balance of equities favors relief. (Id. at 18-19).

Defendants argue that plaintiffs have failed to make a clear showing of likelihood of success on the merits for two independent reasons. First, they argue that assuming plaintiffs can demonstrate the existence of "state action," the restriction on literature distribution is a valid time, place, and manner speech restriction. (Defs' Opp. at 11-16). Second, defendants argue that even if the restriction is not valid, plaintiffs have failed to establish that the challenged action was "state action." (Id. at 16-20). Because plaintiffs have not made a clear showing of likelihood of success regarding the merits of their First Amendment claim, the court need not reach defendants' second argument.

With respect to the First Amendment analysis, both plaintiffs and defendants agree upon the level of scrutiny that applies to the restriction on literature distribution. See Pls' Mem. at 13; Defs' Mem. at 11. In particular, because the restriction applies to expressive activity on public property at a public event, the restriction must be (1) content-neutral, (2) serve a significant government interest, (3) be narrowly tailored to serve that interest, and (4) leave open ample alternative channels of communication. See Heffron v. International Society for Krishna Consciousness, Inc., 452 U.S. 640, 647-48 (1981); Clatterbuck v. City of Charlottesville, 708 F.3d 549, 555 (4th Cir. 2013); Brown

9

v. Town of Cary, 706 F.3d 294, 305 (4th Cir. 2013). The court will address each of these requirements in turn.

1. Content-netural

As confirmed at oral argument in this matter, plaintiffs do not dispute that the restriction in this case is content-neutral. See Pls' Mem. at 14. Indeed, the Supreme Court in Heffron held that a similar restriction on literature distribution at a state fair was content-neutral, where it prohibited distribution and sale of written materials except from a booth rented for those purposes. See Heffron, 452 U.S. at 648-49.

2. Significant government interest

Defendants assert that the restriction on literature distribution serves a significant and legitimate interest (1) in maintaining orderly movement of Festival attendees and minimizing crowd congestion, and (2) in minimizing litter and trash pick-up. (Defs' Opp. at 13). For purposes of the present order, the court need only address the first interest asserted.

With respect to the interest in maintaining orderly movement and minimizing crowd congestion, this case is analogous to Heffron. There, the Minnesota Agricultural Society, a public corporation, operated an annual state fair on a state-owned tract of land. Heffron, 452 U.S. at 643. The Society adopted a rule prohibiting sale or distribution of any merchandise, including printed or written material, except at designated fixed locations within the fair grounds, stating that violation of the rule shall be punished as a misdemeanor. Id. The International Society for Krishna Consciousness, Inc., a religious group, filed suit against the Society and other state officials seeking injunctive and declaratory relief prohibiting enforcement of the rule and declaring that the rule violated their First Amendment rights to distribute religious literature. Id. at 644-45. The Supreme

10

Court held that the rule did not violate plaintiffs' First Amendment rights because it was content-netural, narrowly drawn to serve a significant government interest, and allowed alternative channels for expressing plaintiffs' views. Id. at 648-56.

In Heffron, "the principal justification asserted by the State in support of [the restriction was] the need to maintain the orderly movement of the crowd given the large number of exhibitors and persons attending the fair." Id. at 649-50. This same justification is asserted here. (Exhibit A ¶7). The Supreme Court held that "[b]ecause the Fair attracts large crowds, it is apparent that the State's interest in the orderly movement and control of such an assembly of persons is a substantial consideration." Id. at 650. In making this determination, the court noted that "significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved." Id. at 650-51. The court noted that "there are significant differences between a street and the fairgrounds": whereas a street is "continually open, often uncongested" and "a relaxed environment," the fair "is a temporary event attracting great numbers of visitors who come to the event for a short period to see and experience a host of exhibits and attactions," and the "flow of the crowd and demands of safety are far more pressing in the context of the Fair." Id. at 651.

The same is true of the Dogwood Festival, here, which attracts a very large number of people in a limited amount of time and space, and where the festival streets are closed to vehicles and crowded with pedestrians. On Saturday, April 28, 2012, during the Festival, crowds measured about 100,000-150,000 persons within a Festival footprint of 40.3 acres of downtown Fayetteville. (Defs' Ex. A. ¶¶ 8-9). The pedestrian corridor leading to from the stage area to the traffic circle is a high-traffic area that is regularly congested during the Festival, and the Dogwood Festival discourages

11

congregation in the corridor and utilizes bike racks to simulate entry and exit lanes. (Id. ¶ 16). Based on this record, the court finds that maintaining orderly movement of Festival attendees and minimizing crowd congestion is a significant government interest in the context of the Dogwood Festival.

3. Narrowly-tailored

With respect to whether a restriction is narrowly tailored to a government interest, a time, place, or manner restriction "need not be the least restrictive or least intrusive means" of serving the government's legitimate interest. Ward v. Rock Against Racism, 491 U.S. 781, 798 (1989). "Rather, the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." Id. at 799 (quotations omitted). "So long as the means chosen are not substantially broader than necessary to achieve the government's interest, . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." Id. at 800 (emphasis added). "The validity of time, place, or manner regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted." Id. (quotations omitted).

In this case, defendants contend that the restriction is narrowly tailored because it does not present a complete ban on literature distribution and it does not prevent plaintiffs from mingling with the crowd and orally propagating their message. The Supreme Court applied similar reasoning in Heffron in upholding the restriction there, where the court observed that the rule in that case did not "deny access within the forum in question." Id. at 655. The rule did not exclude the religious group

12

from the fairgrounds, nor did it prohibit its members from "mingl[ing] with the crowd and orally propagat[ing] their views." Id. at 655. In addition, the court found it important that the rule allowed an organization to "arrange for a booth and distribute and sell literature" from that location. Id.

The restriction in the present case includes all the same exceptions as the restriction in Heffron, and it is even more narrowly-tailored because it allows people seeking to distribute literature to do so freely from Linear Park, which is within the closed-street confines of the Festival. (See Defs' Ex. A at 7). Accordingly, the court finds that the restriction is not "substantially broader" than necessary to achieve orderly movement and crowd control. Ward, 491 U.S. at 800. While plaintiffs object to the adequacy of Linear Park, and while other areas of the Festival also may be appropriate for literature distribution, it is not the role of the court to determine whether the government's interest could be adequately served by some less-speech-restrictive alternative. See Ward, 491 U.S. at 800.

Further, as emphasized in Heffron, the justification for the restriction must not be measured by the disorder that would result from allowing only the individual plaintiffs to distribute literature, but must be measured from the disorder that would result from allowing anyone and everyone to distribute literature as exempted by the rule. See Heffron, 452 U.S. at 652. Thus, the court does not find particularly pertinent plaintiffs' assertion that "they did not create any traffic back-up; they didn't block anyone's way," see Pls' Mem. at 7, where the court must look instead to the impact of all literature distribution in general on the orderly movement of attendees and relieving crowd congestion. See Heffron, 452 U.S. at 652. Evidence presented by defendants tends to show that a restriction on distribution of literature, except in designated areas, serves to promote orderly pedestrian flow and to relieve crowd congestion. (Defs' Ex. A ¶¶ 7-16, 25; Ex. B. ¶8). Therefore,

13

on the present record, plaintiffs have failed to make a clear showing that the restriction is not narrowly tailored to address the concerns of orderly movement and crowd control.

Plaintiffs contend this case is analogous to two recent Sixth Circuit cases involving literature distribution restrictions, in contrast to Heffron. First, plaintiffs cite to Saieg v. City of Dearborn, 641 F.3d 727 (6th Cir. 2011), in which the City of Dearborn police instituted a leafleting restriction during the Arab International Festival, held annually in the city. The restriction there prohibited leafleting from the sidewalks directly adjacent to Festival attractions and sidewalks and roads that surround the Festival's core, only allowing leafleting from a stationary booth. Id. at 729-30. The court held that the leafleting restriction violated First Amendment rights of a group of Christians who sought to distribute leaflets at the Festival. Id. at 730.

Saieg is distinguishable from the present case in several key respects. First, the court observed that the restriction on leafleting from sidewalks directly adjacent to Festival attractions did not serve a substantial government interest because the City permits sidewalk vendors to set up booths on those same sidewalks. Saieg, 641 F.3d at 730. Accordingly, the restriction was not narrowly tailored to any legitimate interest in pedestrian flow because the vendors on those same sidewalks would have the same effect of slowing traffic. See id. at 730 & 737. In the present case, by contrast, plaintiffs seek to leaflet in the traffic circle, an area in which there are no other booths or activities, but where the Festival has in fact set up racks to channel pedestrian traffic. (Defs' Ex. A ¶ 16). Second, the police department in Saieg required that distribution of leaflets occur only from a "fixed location," meaning an information table. 641 F.3d at 731. In the present case, by contrast, the Dogwood Festival offers an option of renting a booth or distributing literature in Linear Park. (Defs' Ex. A ¶ 20).

14

Third, Saieg considered the restriction in that case on the record following ruling on summary judgment. Thus the parties' respective burdens were different, and the court suggested that the government had a high burden to bring forth evidence, more than mere speculation, about crowd control and public safety concerns underlying the leafleting restriction. Id. at 739. For purposes of the present motion, by contrast, the plaintiffs must make a "clear showing" of likelihood of success on the merits. Winter, 555 U.S. at 22. Indeed, it is notable in this regard that the court in Saieg considered an emergency motion for injunction pending appeal, and the Court of Appeals directed the defendants to permit distribution of religious literature within the "'outer perimeter' or 'buffer zone,' *but not 'within the Festival itself.'*" Id. at 733 (emphasis added). Thus, when considering the case under an emergency injunction standard, the court upheld the restriction as it applied to distribution of literature within the festival, even though it ultimately struck down the restriction at a later stage in the case. Accordingly, the court finds Saieg inapposite.[3]

Plaintiffs also cite to Bays v. City of Fairborn, 688 F.3d 814, 822-24 (6th Cir. 2012), in which the court held that plaintiffs were entitled to a preliminary injunction preventing enforcement of a restriction on their expression of religious messages during the annual Fairborn Sweet Corn Festival. Bays, however, also is distinguishable in several key respects. First, the restriction in Bays was much broader than the present case, in that it prohibited "any solicitation of causes" and "one-on-one

---

[3] At oral argument, plaintiffs emphasized that the festival in Saieg did not require paid admission, like the Dogwood Festival here, but in contrast to the state fair in Heffron. See 452 U.S. at 658 (Brennan J., dissenting); Saieg, 641 F.3d at 737. Although this is a distinguishing fact between this case and Heffron, the majority in Heffron did not mention paid admission as a factor in its analysis. Rather the court emphasized several features of the state fair which are analogous to the characteristics of the Dogwood Festival. See 452 U.S. at 651 (noting the fair is "a temporary event attracting great numbers of visitors who come to the event for a short period to see and experience a host of exhibits and attractions," and "flow of the crows and demands of safety are more pressing in the context of the Fair"). Accordingly, the court does not find the difference between paid admission and free admission determinative to the court's analysis, where in both Heffron and the present case the more pertinent factors include the very large number of people in attendance within a narrow footprint of the festival layout, and the alternatives provided for First Amendment expression.

15

conversations," including stationary preaching. Bays, 668 F.3d at 823. Second, unlike here, the City of Fairborn did not "point[] to any specific space or crowd concerns at the Festival." Id. Third, the description of the interactions between plaintiffs and the police was not disputed, and the record showed there that police stated: "If we start getting approached by people who say, hey these two guys are approaching me and bothering me and talking about stuff I don't want to hear, then you're going to have a problem." Id. at 824. In the present case, by contrast, the restriction did not in any respect prohibit plaintiffs from mingling with the crowd and orally stating their views. In fact, this was a key factor that the court in Bays used to distinguish that case from Heffron. Id. at 824.

In sum, this case is aligned with Heffron in several respects, and is distinguished from the recent Sixth Circuit cases for several others, regarding whether the restriction in this case is narrowly tailored to a significant government interest. In addition, while the present case may be compared and contrasted in various respects with Saieg and Bays, those cases are not binding precedent in this Circuit, and the Fourth Circuit has yet to distinguish Heffron on the grounds relied upon by the Sixth Circuit. Accordingly, the court is constrained to conclude that plaintiffs have not made a clear showing of likelihood of success on the merits on this prong of the First Amendment analysis.[4]

---

[4] Plaintiffs mentioned two other Supreme Court cases at oral argument, which the court finds inapposite. In United States v. Grace, 461 U.S. 171, 183 (1983), the court found unconstitutional a prohibition of carrying signs or banners on public sidewalks surrounding the U.S. Supreme Court building. Unlike the present restriction, the prohibition in Grace was permanent, and it was not justified on the basis of orderly flow of people for purposes of an event drawing crowds over a single weekend. See id. at 182 & 183. In ISKCON v. Lee, 505 U.S. 672, 685 (1992), the Supreme Court upheld a total ban on solicitation in an airport, under a different "reasonableness" standard. That said, some of the court's observations in Lee could inform the analysis here, especially the observation that "[t]he inconveniences to passengers and the burdens on [airport] officials flowing from solicitation activity may seem small, but viewed against the fact that pedestrian congestion is one of the greatest problems facing the three terminals, the [airport] could reasonably worry that even such incremental effects would prove quite disruptive." Id. at 685 (quotations omitted).

4. Ample alternative channels of communication

The final prong of the First Amendment analysis involves some issues overlapping with those already considered above. In particular, as noted by the Supreme Court in Heffron, there was a sufficient alternative means of communication there where the rule "has not been shown to deny access within the forum in question," and it offers plaintiffs the opportunity to "mingle with the crowd and orally propogate their views." Heffron 452 U.S. at 655. The restriction in this case offers such alternative means, plus it allows for distribution of literature from Linear Park and from a non-profit booth.

Although subject to some disputed issues of fact, it appears that defendants' argument regarding the adequacy of Linear Park and the booth alternative has support in the record, and plaintiffs have not met their burden of making a clear showing of likelihood of success as to these alternative means of expression. Plaintiffs contend, for example, that Linear Park is "woefully inadequate," noting that it is an "isolated area." (Pls' Mem. at 9). Defendants point out, however, that Linear Park is "the front door to the Festival," and that access to pedestrian traffic may be better than the traffic circle because a "pedestrian shuttle pick-up and drop-off site is located steps away from Linear Park at the corner of Mason and Arch Street." (Defs' Mem. at 15). Further"[f]estival attendees utilize parking lots on both sides of Linear Park," and "[p]edestrians access food vendors and activities within Festival Park from the major entrance located across from Linear Park along Ray Avenue. (Defs' Mem. at 15). These assertions are supported by the maps and affidavits in the record. (See Defs' Ex. A ¶ 15, Ex. H, Ex. I).

With respect to the booth alternative, plaintiffs raise several reasons why the booths are not a "workable option," including inability to qualify for a booth, inability to obtain one, and

17

ineffectiveness of a booth to further their message. (Pls' Mem. at 9). The limited availability of nonprofit booths has some support in the record. (See Pls' Ex. M. - vendor application form noting "limited # of spaces for local charities only"). Nonetheless, plaintiffs offer no evidence that they ever applied for, or even expressed interest in, obtaining a booth. Because plaintiffs did not apply for a booth, they offer only speculation that they would not be qualified to obtain one. Indeed, defendants note that all those who applied for a non-profit booth in 2012 were approved. (Defs' Ex. A ¶ 13). Further, the issue whether a booth can provide an adequate alternative for plaintiffs seeking to distribute religious literature is an issue that was similarly addressed by the Supreme Court in Heffron. As in Heffron, and equally applicable here, "[t]he booths are not secreted away in some nonaccessible location, but are located within the area of the fairgrounds where visitors are expected, and indeed encouraged, to pass." 452 U.S. at 655-56 n. 16. Accordingly, on the present record, the court finds that, although the booths do not provide an ideal means of distribution for plaintiffs, they suffice as an adequate alternative means of expression.

In sum, plaintiffs have failed to make a clear showing of likelihood of success on this prong of their First Amendment claim, or on any of the other prongs of the First Amendment claim. Thus, where plaintiffs have not shown a clear likelihood of success on the merits, a preliminary injunction is not warranted, and the court need not reach the remaining requirements for issuance of a preliminary injunction. See Winter, 555 U.S. at 20.

## CONCLUSION

Based on the foregoing, plaintiffs' motion for preliminary injunction is DENIED. An initial order regarding planning and scheduling for the remainder of the case will follow.

SO ORDERED this the 23rd day of April, 2013.

                                                LOUISE W. FLANAGAN
                                                United States District Judge

19

Case 5:13-cv-00150-FL   Document 25   Filed 04/23/13   Page 19 of 19